(No. 37477.—

AMERICAN NATIONAL BANK AND TRUST COMPANY, Trustee, Appellee, *vs.* THE COUNTY OF COOK, Appellant.

*Opinion filed March 27, 1963.*

DANIEL P. WARD, State's Attorney, of Chicago, (THOMAS A. HETT, Assistant State's Attorney, of counsel,) for appellant.

HASKINS, MAGUIRE & HASKINS, of Chicago, (ROBERT E. HASKINS and C. W. ECKERT, of counsel,) for appellee.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

In a declaratory judgment action brought by the plaintiff, American National Bank and Trust Co., the circuit court of Cook County held that the R-3 classification contained in the Cook County zoning ordinance, as applied to plaintiff's property, was unconstitutional. The county has appealed directly to this court in view of the trial court's certification that in the public interest such a direct appeal should be pursued.

Prior to the commencement of this suit the zoning board of appeals recommended the adoption of an amendment reclassifying the plaintiff's property to R-5; however, the Cook County board of commissioners failed to adopt this recommendation.

The plaintiff's property is located in Maine Township in an unincorporated area of Cook County. It consists of approximately 31 acres located on the north side of Golf Road, an east-west highway, at the northwest corner of Golf Road and Western Avenue, if extended. Its eastern boundary is located approximately 1,300 feet west of the intersection of Greenwood Avenue, a north-south street, Milwaukee Avenue, which runs in a northwest-southeast direction, and Golf Road. The property has a frontage of approximately 973 feet on Golf Road and has a depth of approximately 1,477 feet. The property is presently zoned

R-3, requiring single-family residences on 20,000-square-foot minimum area lots with 100-foot minimum frontage. Prior to the 1960 comprehensive zoning ordinance amendment it had been zoned F (farming) which allowed R-3 development. It is now vacant and was previously used as a nursery. The northern boundary of the subject property is the Commonwealth Edison right of way containing high tension lines and towers. Immediately to the north of this is the Ridgeview Cemetery.

The adjacent property to the east, also fronting on Golf Road, is presently zoned R-5 general residence district. Along Golf Road there are 6 single-family residences. North of these homes is a new multiple-family development containing 26 multiple dwellings, with an additional 10 buildings under construction. Proceeding east, there is a parcel having a frontage of 280 feet on Golf Road and bearing a B-3 general business district classification. Immediately north of this, the property is zoned R-6 general residence district, also a multiple-dwelling classification, and is being developed as such. The northeast corner of Golf Road and Greenwood Avenue is zoned B-2 restricted service district and a gasoline service station is situated thereon.

Immediately west of the subject property is a strip of land also zoned R-3 that, except for a single-family home at Golf Road, is vacant. This property has a frontage of approximately 221 feet on Golf Road and a depth equal to plaintiff's property. Further west and fronting on Golf Road is a 9-hole daily-fee golf course which is zoned R-3. The property directly south of the golf course, containing an area of more than 80 acres, is zoned R-5 general residence district, the classification sought by plaintiff. This area faces one third of plaintiff's property. In this area at Potter Road, about 3 or 4 blocks west of the subject property, south of Golf Road, there are 20 to 25 town-

houses and expensive single-family homes, as well as much vacant land. On the south side of Golf Road the land directly opposite the remainder of plaintiff's property has been used for approximately 15 to 20 years and is being used at the present time as a combination nursery and truck farm and contains a produce stand. East of Western Avenue and extending to Greenwood Avenue, the land is zoned and developed under the R-4 single-family residence district classification. Eleven of the homes in this subdivision face Golf Road but are actually fronting on Elm Drive, an access road. Immediately to the east of this area across Greenwood Avenue and running parallel to this subdivision, is the Golf-Mill Shopping Center, an 88-acre tract.

Henry Kyatt, the husband of the beneficial owner under the trust which is the purchaser under a contract of purchase, testified that $14,500 per acre was paid for the property and that it was known that the proposed zoning of the property would be R-3, single-family, under the then proposed zoning ordinance amendment. He testified that he considered this zoning ridiculous, and therefore the price was fair. He proposes to develop the 31 acres of the subject property with 324 units of duplex apartments of two and three bedrooms. This would only be permitted under an R-5 classification.

The expert valuation witnesses presented by both sides stated that if the property were developed in accordance with its present zoning the sale price of a fully improved lot would be from $8,000 to $15,000. They also seemed to agree that this priced lot would require that homes costing in the area of $40,000 be erected. A development of this nature, according to plaintiff's witnesses, would not be economically feasible because people planning to build such a home would not buy in the neighborhood of apartment buildings and a heavily travelled road such as Golf Road. One of plaintiff's witnesses testified that the prop-

erty as raw ground was only worth $4,500 to $5,000 per acre as R-3. Plaintiff's witnesses said that the highest and best use of the subject property was for R-5 development as proposed by plaintiff and that there would be no adverse effect caused by the proposed multiple-family development on any of the properties surrounding the subject property.

Defendant's expert valuation witness testified that $14,000 per acre is a fair price to pay for R-3 zoned property. He testified that it would be economically feasible to build and sell the $40,000 homes in this area because it was only one of four remaining vacant tracts in the area and pointed to the expensive single-family homes near the townhouse development at Potter Road. He noted that there are only 400 undeveloped R-3 acres left in Maine Township, and there is an extensive area of apartment buildings southwest of the subject property in another neighborhood which makes this property ideal for single-family development.

Defendant's witnesses said that the highest and best use of the property was for development of single-family residences as zoned. Also, they stated that the proposed development would increase traffic on Golf Road because there are no secondary streets between Milwaukee Avenue and the subject property that have egress to Golf and that the traffic from the R-5 development east of the subject property would come through the proposed development. They testified that the proposal would adversely affect the R-3 land west of the subject property, including the golf course which according to them is a transitory use, and which normally would be developed as zoned. Defendant's witnesses were of the opinion that there would be a diminishing of value of the single-family homes along Elm Drive and in the Golf-Greenwood Gardens subdivision, to the southeast. Certain residents of this subdivision also felt that there would be an adverse effect on the area as a

whole, aggravating already existent problems relating to the inadequate water supply, poor drainage and heavy traffic.

Defendant's witnesses stated that the proposed development as multiple-family would create a hardship upon an already over-burdened school district by producing more children of elementary school age and preschool age without corresponding tax money. The superintendent of the school district testified that there were more multiple-family developments in this school district than in neighboring ones. He stated that a bond issue for school construction and teachers' salaries had been recently defeated, leaving barely enough funds available to properly educate the existing school children. If the plaintiff's proposal was allowed, the superintendent stated, it would overtax the district, which will have schools on shifts this year; according to a nearby resident it would also lead to further overtaxing by the subsequent multiples which will inevitably encroach upon the single-family district. Based upon the foregoing evidence the trial court specifically found that "a multiple family development would conform with the present dominant characteristics of the area * * *" and that said development "will not adversely affect the residential property east and west of the subject property."

Plaintiff's witnesses felt that the homes in the single-family residential subdivision to the southeast would not be affected by plaintiff's development since that area was already close to multiple housing on the north and west and commercial development on the east. The property owners in this subdivision who testified for the defendant confirmed this opinion to an extent; one witness testified that he objected to plaintiff's proposed rezoning because the children in the subdivision were "not safe since those townhouses were built west of us;" another stated that homes in the subdivision had sold for less within the last three years due to the development to the west.

The evidence disclosed that the Golf-Greenwood Gardens subdivision was begun 15 to 20 years ago and was developed under a R-4 classification requiring only 10,000 square feet per lot and that there had been no new single-family residential development along Golf Road within a mile in each direction of the subject property during the last several years. Plaintiff's property is bordered on the east by multiple development, on the south, across the highway, in part by property zoned for multiple development and in part by a produce stand and truck farm. On the west the narrow adjacent tract could not, according to plaintiff's expert, be developed as zoned (R-3), and would not, therefore, be reduced in value by plaintiff's development. Adjacent to this narrow tract is a 40-acre golf course, which is a permitted recreational use under the R-3 zoning. Defendant's own expert appraiser indicated, however, that this daily-fee golf course should be considered a commercial usage and that it had been operating as such for at least 10 to 15 years. Under these circumstances we feel that the trial court's finding that the classification of plaintiff's property as R-3 was arbitrary and void is supported by the evidence and is correct.

The other factors mentioned by appellant in urging the validity of the present R-3 classification, increased traffic, inadequate water supply, and poor drainage, appeared to be problems that affected the area generally. Golf Road was admittedly one of the busiest streets in this part of the county, and according to a traffic count carried from the hours of 10:00 P.M. to 2:00 A.M., 4000 cars hourly. Nevertheless, an engineer who testified for plaintiff was of the opinion that, through proper channelization of the traffic from the access road onto Golf Road, the increased traffic problem created by the proposed apartments would be no greater than if the property were developed as R-3. Defendant's expert testified that a portion of the increased traffic considered by him would be from

the adjacent apartments to the east that would utilize the streets in plaintiff's development.

The defendant's evidence regarding the water and drainage consisted simply of individual neighbors from the subdivision across the street testifying that they had experienced problems along these lines and that in their opinion plaintiff's proposed apartments would not be helpful to these problems. No engineer, or other expert, or representative of the utilities company serving the area, testified that plaintiff's development would actually aggravate the water or storm drainage difficulties. The plaintiff's engineer, on the other hand, stated that the present water supply and storm sewage facilities were fully adequate to service plaintiff's property.

The problems concerning heavy traffic, the inadequate water supply and the poor drainage facilities were not, therefore, shown to have been sufficiently related to plaintiff's proposed development to justify the continued single-family classification, which classification was found by the court to be contrary to the development trend in the area. *La Salle National Bank* v. *City of Highland Park,* ante, 350.

Finally, appellant contends that to rezone the subject property for multiple housing would create an increased burden upon the schools in the district. Specific data concerning the probable effect of plaintiff's proposed development upon the schools serving this area was not presented and therefore this contention will not be considered.

The evidence disclosed that the best use of plaintiff's property was for multiple housing and that the other property in the area would not be adversely affected by allowing said development under the R-5 classification. On the other hand, it appeared that, unless rezoned, plaintiff's property could not be economically developed and would be substantially reduced in value. Problems concerning heavy traffic, inadequate water, drainage, and over-crowded

schools were shown to be general in nature. There was considerable other R-5 property nearby and no attempt on the part of the county to limit multiple housing in this area because of these factors was shown, and there was no evidence of any substantial relationship of the plaintiff's proposed development to these problems. Accordingly, the judgment of the circuit court of Cook County holding the R-3 zoning classification to be unreasonable and arbitrary and declaring that plaintiff's property may be developed in accordance with the R-5 classification is affirmed.

*Judgment affirmed.*